UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.

JESSE MONTGOMERY,

          Defendant.

_____/

CRIM. CASE NO. 16-20266

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

## ORDER GRANTING DEFENDANT'S
## MOTION TO SUPPRESS FIREARM AND STATEMENTS

Defendant Jesse Montgomery is charged with being a felon in possession of a

firearm. On July 19, 2016, Defendant filed a Motion to Suppress the firearm seized from

him, and certain statements made by him to the arresting officers. (ECF No. 25, Mot. to

Suppress). On August 23, 2016, the Government filed its Response. (ECF No. 28, Resp.

to Mot. to Suppress). The Court held an extensive evidentiary hearing on November 30,

2016, after which the Court ordered supplemental briefing. Supplemental briefs were

filed on January 3, 2017 (after the parties received the requested transcript) (ECF Nos. 34,

35).

### Overview

Defendant Jesse Montgomery was the rear seat passenger in a van driven by Fred

1

Archie on March 20, 2016. Four Detroit Police Department (DPD) Special Operations Officers riding in a marked vehicle, conducted a traffic stop of the van for allegedly changing lanes without signaling.

The officers testified that upon approaching the stopped van they smelled burnt marijuana. They ordered the three occupants out of the van, frisked them, handcuffed the driver, and took all three individuals to the back of the van/front of the police car. Two officers held the occupants; two officers searched the van for contraband.

While holding the occupants, Officer Kijuan Anderson told the occupants that he knew they had a gun, that they weren't going to leave until someone gave up a gun, and that if they gave up a gun, no one would be prosecuted.

Defendant Montgomery, who had previously been patted down, after being assured by Officer Anderson, again and again that they wouldn't be allowed to leave if they didn't give up a gun, and that if they gave up a gun no one would be prosecuted, told Officer Anderson that he had a gun in his waist area. Anderson searched Defendant Montgomery and secured a gun that had been missed in the earlier initial frisking process that occurred when the occupants were initially ordered out of the van.

Among the legal issues discussed in the briefings, and at the evidentiary hearing:

> (1) Whether the initial police stop of the van for allegedly
> changing lanes without signaling was proper.
>
> (2) Whether the initial pat-down search of the Defendant and
> the other two occupants, and the search of the van for
> marijuana that the police smelled upon approaching the van,

2

was proper. (No contraband was found; no drugs or guns).

(3) Whether ordering the three occupants out, handcuffing the driver, taking all three to the rear of the van/front of the police car, and continuing to hold them, question them and threaten them while the other officers searched the van for marijuana, was proper.

(4) Whether the continued detention of the occupants to question them about having a weapon, during which the police told them that they would not be permitted to leave unless someone gave up a gun, and the police promise that no one would be prosecuted if a gun was turned over, was proper under the Fourth and Fifth Amendments.

(5) Whether the detained Defendant's ultimate admission, after Officer Anderson's threats, that he had a gun was coerced under the Fifth Amendment.

(6) Whether the Defendant's gun and statements should be excluded as fruit of the poisonous tree (illegal stop) under the exclusionary rule.

The Court concludes that the officers did not have a legal basis to stop the van, and the exclusionary rule applies to the conduct of the officers, requiring suppression of the fruits of the unlawful seizure and search: the firearm seized from Defendant, and his coerced inculpatory statements regarding the firearm.

This Opinion will initially provide an overview of the relevant testimony from the November 30, 2016 evidentiary hearing, and then provide the Court's factual findings and the Court's legal analysis.[1]

---

[1] The Opinion provides supporting citations to the record. By providing a specific citation, the Court does not imply that the cited evidence is the sole support in the record for a particular finding. The Court's findings are based upon the totality of the evidence presented at the hearing.

3

## Relevant Testimony at the Evidentiary Hearing

Detroit Police Officer Kijuan Anderson testified that he was one of four officers in a Special Operations patrol car on March 20, 2016. Anderson was the driver. The other occupants were Officers Christopher Rabior and Joseph Ceravolo, and a Sergeant who was subsequently tragically killed in the line of duty in another case, prior to the instant hearing.

The police vehicle did not have a functioning audio/video recorder despite a departmental requirement that it be operational. The Sergeant, nevertheless, ordered them to use that car because it was the only patrol car available. (ECF No. 33, Transcript of Nov. 30, 2016 Evidentiary Hrg. 12-19). Anderson testified that he was driving around 5:00 p.m. on East Outer Drive, a two-way traffic street with three lanes on each side, and a grass median containing trees.

Anderson testified that he observed a van across the median, traveling in the opposite direction that veered to the right without signaling. Tr. at 21. Anderson testified that while the Special Operations unit's general duties were "Guns, narcotics, fugitive, high crime shootings, homicides," they were also responsible for pulling people over for civil infractions. Tr. at 43. Anderson testified that the March 20, 2016 daily activity log that he read and signed stated that the squad car's audio/visual equipment was operational. Tr. at 48. But, it wasn't. Tr. at 49.[2] Officer Anderson testified that the crew

---

[2] Anderson also testified that the activity log was incorrect when it stated that no repairs to the car were required. Tr. at 52.

went out that day knowing that their "actions" would not be recorded. Tr. at 50.

Officer Anderson testified that there were trees lining the wide Outer Drive grass median, separating the three lanes on each side. Tr. at 55. The median separated the police car's direction of travel from the van's opposite direction of travel. Tr. at 56.

Officer Anderson testified that unlike general DPD patrol cars, the special operations unit does not radio to dispatch to report when they pull over a vehicle, "because they're [patrol cars] at service [answering runs] and we're not." Tr. at 61. Thus, in addition to the lack of an audio-video record of the crew's activity, there was no radio communication dispatch tape available to verify what time the stop occurred and when it concluded.

The second Officer called to the stand, Christopher Rabior, who was in the front passenger seat, testified that there are trees in the Outer Drive median: "Periodically, I believe so." Tr. at 98. Officer Joseph Ceravolo, who sat in the back seat and testified third stated, in contradiction, that there were no trees in the grassy median. Tr. at 136. The Government introduced Exhibit 2, an aero photo which clearly evidences the Outer Drive grassy median and trees.

Defendant's first witness Tommy Bell, Jr. testified that he rode in the van's passenger seat, that the van had been traveling only in the middle lane for a long period of time before they were stopped, and that the driver never swerved or switched into another lane during that period. Tr. at 143.

5

Defendant's second witness, Freddie Archie, the driver of the van, testified that he was driving down the middle lane – going straight, when he was pulled over, Tr. at 189, and that he never changed lanes during the 5-10 minutes he was driving in the middle lane. Tr. at 194.

Anderson testified that after seeing the van change lanes without signaling, he made a U-turn, activated the siren and lights, and after proceeding for a half a block or a full block the van pulled over. Tr. at 22. Anderson testified that during the "rolling" stop, despite the van having tinted rear windows, he saw a lot of movement by the back seat passenger. Tr. at 24. He was concerned that the backseat passenger might be concealing a weapon or narcotics. Tr. at 27. There were three people in the van; Archie the driver, Bell the front seat passenger, and Defendant Montgomery the rear passenger. Tr. at 25.

After stopping the van, the four officers approached the van. Upon approaching the driver, Officer Anderson smelled a strong odor of fresh burnt marijuana and ordered all three occupants to show their hands. Anderson had his hand on his gun – not drawn. Anderson testified that this was "just a normal traffic stop." Tr. at 30. Anderson testified that he informed the driver that he smelled the odor of burnt marijuana, to which the driver responded, "we just got done smoking." Tr. at 30. Both defense witnesses Archie and Bell denied making any such statement. Anderson testified that he didn't remember if the driver appeared high. Tr. at 31. Anderson announced they were going to search the

van for marijuana; removed the driver, handcuffed him, and removed the two passengers but did not handcuff them. Tr. at 31. All three occupants were brought to the back of the van/the front of the police car. Anderson patted down the driver. Tr. at 32. The other two occupants, Archie and Defendant Montgomery were also patted down. Officers Ceravolo and Rabior searched the van, and found no contraband or even marijuana remnants. Tr. at 33.

Anderson testified that while the two officers were searching the van, he asked Defendant Montgomery if there were any weapons or contraband. Defendant didn't answer yes or no. Defendant said he was a pizza delivery man, and that it's a dangerous job. Tr. at 35. Anderson testified again that Defendants said "we just got done smoking [marijuana]." Tr. at 36. The two occupants testified that this was never said by any of the van's occupants.

Anderson told Defendant that the police car was equipped with an electronic "wand" device that detects guns. This was not true. Tr. at 34. Anderson also said he'd get a K-9 to search the van. That was not true. Tr. at 36. Meanwhile the two searching officers didn't find any contraband in the van. Tr. at 37. Anderson testified that Defendant asked him – if the police find a gun, will he let the three go? Anderson answered "yeah," "I'll let you go," "I told you, I'm not taking anyone to jail." Tr. at 35-36. Defendant had previously been frisked/searched by officers, and no contraband was discovered.

7

Anderson testified that he started jokingly conversing with Defendant:

> Are you checked already? He said, "No, they already checked
> me." I said "are you sure you don't have anything else
> because you got a lot of stuff in your pockets." Tr. at 38.

Anderson testified that he then began to search Defendant, and Defendant said he wasn't
going to lie: he had a gun, which was positioned straight across his waistband. Tr. at 38.
Anderson then arrested Defendant. Tr. at 39. Anderson testified that at the time of the
arrest the other two officers were still searching the van. Tr. at 40. The van's driver was
issued a traffic citation. Tr. at 40-41. Anderson testified that it took 5-10 minutes from
the stop until he found the gun on Defendant. Tr. at 41.

On cross-examination, Anderson testified that trees lined the median of the street
that separated his direction of travel from that of the van. Tr. at 55-56.

Anderson testified that he didn't initially see Defendant in possession of any
weapon or contraband. Tr. at 65. Nor was the gun seized during the initial pat-down of
the Defendant.

None of the searching officers ever found any contraband or even remnants of
recently used marijuana in the van. Tr. at 72. Anderson testified that he was lying to
Defendant about the "wand" and the K-9, because "[Defendant] was lying to me." Tr. at
75. Anderson testified that the occupants were being guarded by the officers talking to
them, while the other officers were searching the van. The occupants had been ordered to
stand and remain in a specific spot: they were not free to leave. Tr. at 78. Anderson

8

testified that he didn't know what time he searched Defendant. Tr. at 79. Anderson stated that he continued to converse with the Defendant, and kept asserting that he was sure there was a gun and the officers were going to find it.

Defendant had not been advised of his Miranda rights by Anderson. The police had the keys to the van, and the driver was in handcuffs. Anderson stated that Defendant had not been arrested. Tr. at 82. Anderson had no personal knowledge whether any marijuana was actually consumed in the van, and agreed that it wouldn't be illegal for someone to have previously used marijuana, and then entered the van. Tr. at 86-87.

The Government's second witness was Detroit Police Officer Christopher Rabior. Tr. at 91. He testified that he observed the van change lanes without signaling. Rabior testified that through the van's dark-tinted rear window, he saw the rear passenger of the van looking behind himself repeatedly, arching his back – like he was attempting to conceal something. Tr. at 101. He testified to the rolling stop of the van, and the strong odor of marijuana being emitted from it. Tr. at 103. Rabior was the first officer to have contact with Defendant Montgomery. Tr. at 104. He testified that due to the marijuana odor, the police removed all three occupants, and had them stand at the rear of the van in front of the police car. Tr. at 105. He testified that he "probably did" a quick frisk of Defendant after removing him from the van – he was not sure. Tr. at 105. Officer Rabior, and Officer Joseph Ceravolo thoroughly searched the van for marijuana in "easily under 20 minutes." Tr. at 107. They didn't find any marijuana or residue, or other

9

contraband. Tr. at 128. Rabior testified that he was still searching the van when he was made aware that Anderson found a gun. Tr. at 108.

Rabior didn't recall that any of the occupants showed him a medical marijuana card. Tr. at 108. He believed that he continued searching the van after Officer Anderson found a gun. Tr. at 109. Rabior got Defendant to step out of the van and conducted a pat-down to make sure that Defendant did not have any weapons – he testified that it was not a search. Tr. at 125. Rabior did not pat down Defendant's entire body – not a thorough pat-down – just a brief pat-down. Tr. at 125-26. Rabior didn't believe he handcuffed Defendant. Tr. at 127. Defendant was told to stand at the rear of the van with the Sergeant and Anderson, while Rabior and Ceravolo searched the interior. Tr. at 126. He didn't remember if Defendant Montgomery showed him a medical marijuana card. Tr. at 128. Nor did Rabior remember whether he asked Defendant to provide the medical marijuana card. Tr. at 128.

Rabior testified that the search took "maybe 20 minutes," not extensively long. Tr. at 129. Rabior testified that while his van search was ongoing, Officer Anderson told him he'd recovered a gun from Defendant. Tr. at 129.

The final government witness was Detroit Police Officer Joseph Ceravolo. Tr. at 131. Ceravolo testified that he was in the front passenger seat (Tr. at 134), and that there was a grassy median, with no trees. Tr. at 136. He testified that he was advised by Officer Anderson that "he observed a gold minivan failed to signal a lane change." Tr. at

137. Ceravolo did not see the van change lanes. *Id.* Ceravolo testified that during the van's rolling stop, through the tinted rear van window, he saw Defendant, the back seat passenger, making movements towards the front of his waistband. Tr. at 139. As he approached the van, he smelled the strong odor of marijuana. Tr. at 140. After the police ordered the occupants out of the van, he did a quick search of the front seat passenger, Mr. Bell, for marijuana; he doesn't recall if he handcuffed him. Tr. at 142. Answering the question from the prosecutor: "did you conduct a pat-down?" Officer Ceravolo said: "I did a search," "a quick search for marijuana," and for weapons. Tr. at 142. Ceravolo testified that he and Rabior began a probable cause search of the vehicle for marijuana. Ceravolo testified that when he was done with his vehicle search he was advised by Anderson that he'd recovered a weapon. Tr. at 144.

Ceravolo testified that he arrested Defendant Montgomery and transported him to the Detroit Detention Center. Tr. at 145.

On cross-examination, Officer Ceravolo testified he smelled marijuana: he couldn't say if he smelled burnt or unburnt marijuana. Tr. at 148. Ceravolo did testify that he conducted a search of the front passenger (Bell):

> Q.    And that full search, obviously his entire body, correct?
> A.    It was more of a quick search . . . .
>       . . . .
> A.    It was a search, but not an in-depth search.

Tr. at 149.

11

Officer Ceravolo testified that he alerted Officer Anderson that he didn't find anything after he was done searching the car, at which time Anderson told him he'd found a gun. Tr. at 150. He testified that his report did not indicate what time Defendant Montgomery was taken into custody at the scene. Tr. at 154.  Officer Ceravolo testified that it is not a crime for someone to give off the odor of, or smell like, marijuana. Tr. at 155.

Defendant's first witness, Tommy Bell, Jr., was the van's front seat passenger. Bell testified that he and the driver Fred Archie had picked up Defendant at his job – Happy's Pizza. Tr. at 159.  He testified that the driver Freddie Archie had not switched lanes before the stop. Tr. at 163.  Mr. Bell testified that three policemen got out of their scout car with their guns drawn.  The African-American officer came up to the driver, Fred Archie, removed him from the car, and then removed Defendant Montgomery.  Tr. at 166.  Mr. Bell was removed last.

Bell testified that the officers took him and Defendant to the rear of the van and searched them:

> Patted me down, privates, chest, everything I had on.
> Checked my hat, everything. . . .
> Very thorough.

Tr. at 168.  He thought the Sergeant searched the Defendant who was next to him, "thoroughly," "found nothing, too." Tr. at 168.  The two were told to put their hands on the hood.  The Police did not handcuff Mr. Bell or Defendant; they did handcuff Fred

Archie, the driver. Tr. at 169. Mr. Bell did not feel free to leave because they were guarded by the police and told to remain there. Tr. at 169. Also, Officer Anderson still had the keys to the van, and Mr. Archie, the driver was handcuffed.

Mr. Bell testified that the police were speaking a lot to him and Defendant, "asking us for the gun," they said they know it is in the car. We told them we didn't have a gun. Tr. at 170. Officer Anderson insisted that there was a gun in the car, stated that the police had a "wand" metal detector in their car that can detect a gun – that the "wand" is 100% accurate – and that they were also going to call a K-9 to search the car for the gun. Tr. at 171. Bell testified that the only thing the police asked the driver when they first approached the car was "where's the gun?" Nothing about marijuana. Tr. at 172. Bell also testified that he heard Defendant tell the officers that he has a Michigan marijuana card in his wallet and gave it to the black officer, Anderson. Tr. at 172. Defense counsel admitted Montgomery's medical marijuana card as Exhibit A. Bell testified that they were detained for 45 minutes, with police continuously searching the car for a gun. Tr. at 173.

Bell testified that Officer Anderson kept questioning them about a gun; that he offered a deal to them: "if you give up the gun, that he'll just let us go, like with no problem, just let us go," Tr. at 174, that "If I find a gun, it's nobody's gun." Tr. at 177. He testified that Officer Anderson said he was not going to let them leave until he found it, and he meant that. At that time, the police were still searching the van. Tr. at 174. "They found nothing in the vehicle." Tr. at 174. Bell did not feel free to leave. Tr. at

175.

Bell testified that all three occupants were searched three times: first, after exiting

the van, next when Police walked him and Defendant Montgomery back to the rear of the

van/hood of the police car – thorough search: pockets, crotch, feet – and third, after

Montgomery confessed to having a gun. Tr. at 175-79. All searches were the same. Tr. at

183. Bell did not hear Montgomery make any admission that he had a gun when he was

searched a second time. Tr. at 176.

Bell further testified that none of the defendants told the officers that they had

smoked marijuana. Tr. at 176.

The second defense witness was the van driver, Freddie Archie. Tr. at 186. Mr.

Archie testified that he knew Defendant from working with him at Happy's Pizza. Archie

now works at Lipari Foods. Tr. at 188. He testified that while driving, he was in the

middle lane; didn't change lanes. Tr. at 192. He further testified that there were three

officers in the police car, Tr. at 195, that he was removed from the car immediately, that

the officers had their guns drawn, and that the first thing the Officer Anderson said was

"where's the guns." Tr. at 195-96. Archie testified that Officer Anderson never accused

him of failure to signal while changing lanes. Tr. at 196. He further testified that upon

being removed from the van, he was placed in handcuffs, and searched, including a

search of his pockets. Tr. at 197. He also saw the other two occupants searched, nothing

was found. The police searched the van. Tr. at 197-98. He further testified that the

14

officers kept asking all three occupants, "where's the gun," and that he did not feel that he was free to leave, in particular, because he was handcuffed. Tr. at 199. He testified that the police never mentioned anything about marijuana – just guns – and that they searched the van for a gun two to three times. Tr. at 200. Mr. Archie testified that the officers told them they wouldn't be free to leave unless they told them where the gun was; if you don't tell us, we're taking everybody to jail. Tr. at 202. He testified that the Defendant Montgomery was searched at least 2 or 3 times. Tr. at 203.

### Factual Findings

The Court concludes that the police stop and seizure of the van, based upon an allegation of failure to signal a lane change, is not supported by credible evidence establishing probable cause or reasonable suspicion to stop, and thus was illegal under the Fourth Amendment.[3]

The Court credits the testimony of two of the three testifying officers that there were trees in the grassy median on Outer Drive. The Court finds inherently incredible the testimony of one officer that there were no trees in the grassy median. The Court

---

[3] The Court notes that, despite department rules that the Squad car's audio/ visual system be operational, it was not. Had it been operational, that would have provided clear evidence establishing the time of the stop, the visibility across the median, the length of the stop, the visibility inside the tinted rear van window from outside, the length of the search and the time of Defendant's arrest. The Court further notes that because the police car crew was "Special Ops," it didn't communicate with dispatch. Thus, there are no Police dispatch tapes that would provide evidence of the time of the stop and it's length until it's conclusion. Both procedures were in the complete control of the Police.

concludes that the officers could not visually ascertain that a vehicle traveling on the other side of the grassy median containing trees was changing lanes without signaling – the sole justification for the stop. The Court also relies on Government Exhibit B that shows a plethora of trees in the median of six-lane Outer Drive. The Court credits the testimony of the van driver Freddie Archie, and the passenger, Mr. Bell, that the van had been traveling continuously in the middle lane for a long period of time, and that it did not change lanes during the period when the police observed it. The Court does not credit the officers' testimony that across a six-lane road's grassy median containing a multitude of trees, they saw the van, which was driving in the opposite direction, traveling on a six-lane road across that median, change lanes, and fail to signal its movement.

The Court also credits the testimony of Mr. Archie and Mr. Bell that although there was a smell of marijuana in the van, none of the occupants ever told the officers that they had just finished smoking marijuana in the van. This conclusion is bolstered by the fact that the extensive police searching did not turn up any marijuana, roaches, or even remnants of marijuana smoking.

## Legal Discussion

In *Brown v. Illinois*, 95 S. Ct. 2254 (1975), the Supreme Court held that because the defendant was arrested without probable cause and without a warrant, and while in custody made two inculpatory statements, the statements should be excluded as the fruit of the illegal arrest under *Wong Sun v. United States*, 371 U.S. 471 (1963), even though

16

the defendant was subsequently provided full *Miranda* warnings.  In the instant case,

*Miranda* warnings were never provided to Defendant Montgomery while he was in

custody.

The *Brown* decision noted that the exclusionary rule was applied in *Wong Sun*

primarily to protect Fourth Amendment rights: "Protection of the Fifth Amendment right

against self-incrimination was not the Court's paramount concern there." *Brown,* 95 S. Ct.

2259.  In *Brown,* the issue before the Court was whether the defendants' statements were

obtained by exploitation of the illegality of his arrest:

> In order for the causal chain between the illegal arrest and the
> statements made subsequent thereto, to be broken, *Wong Sun*
> requires not merely that the statement meet the Fifth
> Amendment standard of voluntariness, but that it be
> sufficiently an act of free will to purge the primary taint.

*Brown,* 95 S. Ct. 2261 (internal quotation marks and citation omitted).

*Brown* stated that whether a confession is the product of free will under *Wong Sun*

must be answered on the facts of each case.  *Brown* noted that giving *Miranda* warnings

is an important factor, but not the only factor.  In the instant case, (1) no *Miranda*

warnings were provided by the police, (2) the Defendant was in constant detention by the

police, and (3) the confession was coerced by the threats made by Officer Anderson.

The other factors the Court applied in *Brown*:

(1) The temporal proximity of the arrest and the confession;

(2) The presence of intervening circumstances; and

(3) The purpose and flagrancy of the official misconduct.

*Brown*, 95 S. Ct. 2262.

The burden of showing the admissibility of the statement rests on the prosecution. *Brown*, 95 S. Ct. 2262. The prosecution bears the burden of proving, at least by a preponderance of the evidence . . . the voluntariness of the confession. *Missouri v. Seibert*, 124 S. Ct. 2601, n. 2 (2004). In *Brown*, the Supreme Court held that: "The illegality here, moreover, had a quality of purposefulness . . . . the arrest both in design and in execution was investigatory . . . the hope that something might turn up." *Brown*, 95 S. Ct. 2262. The Court finds that such is also the case here.

A recent Supreme Court decision that references *Brown*, requires discussion here: *Utah v. Strieff*, 136 S. Ct. 2056 (2016). In *Strieff* the Court found that although there was an unconstitutional investigatory stop, as there was in the instant case, "the evidence seized as part of the search incident to the arrest is admissible because the officer's discovery of the arrest warrant [for the defendant] attenuated the connection between the unlawful stop and the evidence seized incident to arrest." 136 S. Ct. 2059. In the instant case, there was no outstanding arrest warrant for Defendant Montgomery. Further, the Court concludes that there was no intervening circumstance or attenuation between the unconstitutional conduct – the stop/seizure of Defendant, and the coercive questioning – and the discovery of the evidence [gun] and the confession.

18

*Strieff* noted:

> Under the Court's precedents, the exclusionary rule
> encompasses both the "primary evidence obtained as a direct
> result an illegal search and seizure," and relevant here,
> "evidence later discovered and found to be derivative of an
> illegality, the so-called fruit of the poisonous tree." *Segura v.
> United States*, 468 U.S. 796, 804. But the significant costs of
> this rule have led us to deem it "applicable only . . . where its
> deterrence benefits outweigh its substantial social costs."
> *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

136 S. Ct. 2061 (alteration in original). The Court finds that deterrence is required here.

The *Strieff* majority applied the three *Brown* factors to guide its analysis, and this

Court applies them as well.

First: the temporal proximity between the initially unlawful stop, seizure and

search, favors suppressing the evidence. There was very close proximity between the

initial unlawful stop and the search and the confession and the discovery of the evidence:

this favors suppressing the evidence.

Second: there were no intervening circumstances here, as in *Strieff*.

Third: the police conduct here was purposeful and requires deterrence.  This illegal

stop was not "in connection with a bona fide investigation of a suspected drug house."

*Strieff*, 95 S. Ct. 2063.

In *Herring v. United States*, 129 S. Ct. 695, 698 (2009), the Supreme Court noted

that whether suppression is a proper remedy is related to "the culpability of the police and

the potential of exclusion to deter wrongful police conduct." In the instant case, the Court

19

concludes that exclusion of the gun and the coerced statements will meaningfully deter constitutional violations. The Court also concludes that the exclusion of the gun and the statements here outweighs the resulting social costs. See *Davis v. United States*, 131 S. Ct. 2418, 2427 (2011).

The Court concludes that there was no probable cause or even reasonable suspicion to stop the van, and that the subsequent police seizure, custodial interrogation and search of Defendant Montgomery violated his rights under the Fourth and Fifth Amendments to the Constitution, and that the remedy requires application of the exclusionary rule to prevent introduction of the gun possessed by Defendant Montgomery and his incriminatory statements.

Accordingly, the Court grants Defendant's Motion to Suppress his statements, and the gun, all of which were the "fruit" of the illegal stop and seizure.

SO ORDERED.

DATED:   FEB 1 4 2017

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE